# In the United States Court of Federal Claims

THE QED GROUP LLC d/b/a Q2 IMPACT,

                *Plaintiff,*

v.

THE UNITED STATES,

                *Defendant.*

No. 24-1961C
(Filed March 14, 2025)

Ryan C. Bradel, Ward & Berry, PLLC, Washington, DC, for plaintiff.

Grant D. Johnson, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION
### Interpreting the Statute and Regulations

**SILFEN,** *Judge.*

    QED, doing business as Q2 Impact, protests its disqualification from a large solicitation issued by the General Services Administration (GSA).[1] Q2 Impact alleges that it was improperly disqualified from consideration due to the government's incorrect interpretation of a statutory provision that prohibits government agencies from contracting with entities that use certain high-risk equipment in their work. The government responds that under its interpretation of the statute and the regulations promulgated under the statute, Q2 Impact was properly disqualified. Both parties

---

[1] This opinion was originally issued under seal. The parties had no proposed redactions. The court reissues the opinion publicly.

1

asked the court to interpret the relevant statute and regulations, and Q2 Impact moved for a preliminary injunction.

The court held a hearing on the motions for a statutory interpretation and for a preliminary injunction. After hearing arguments and taking a recess, the court issued a ruling from the bench, interpreting the statute in the way that Q2 Impact, not the government, reads it. The court also denied Q2 Impact's motion for a preliminary injunction without prejudice on the basis that there was no prejudice to Q2 Impact at that time in waiting for a final judgment in the case. The parties requested a written opinion, so this opinion memorializes the court's ruling from the bench on the statutory interpretation. More has happened since the hearing that has changed the parties' arguments on the injunction, so this opinion will not address the request for a preliminary injunction. To the extent that circumstances have changed, this opinion addresses the facts as they were at the time of the hearing, on January 29, 2025.

The court interprets the statute in the way that Q2 Impact reads it. Thus, the court determines that GSA's decision to disqualify Q2 Impact from the solicitation was based on an incorrect interpretation of the statute.

I.      **Background**

Section 889 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 addresses concerns about U.S. government contractors using technology built by Chinese-government-owned companies. It prohibits any federal executive agency from entering into, extending, or renewing a contract "with an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system." Pub L. No. 115-232, § 889(a)(1)(B), 132 Stat. 1636, 1917-18 (2018). Section 889 defines "covered telecommunications equipment or services" as including equipment produced by entities headquartered in China, such as Huawei

Technologies Company, as well as "equipment or services produced or provided by an entity that the Secretary of Defense … reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of [China]." *Id.* at § 889(f)(2)-(3). But § 889 gives certain government officials the authority to grant waivers of that contracting prohibition, allowing the covered equipment to be used in limited circumstances. *Id.* at § 889(d)(1)-(2). Under § 889(d)(1), for two years after the effective date of the provision, until September 2022, an executive agency head could, "on a one-time basis, waive the requirements under subsection (a)" when the agency's contracting office provided "a compelling justification." Section 889(d)(2) separately gives the Director of National Intelligence (DNI) authority, after the first two years, to "provide a waiver … if the Director determines the waiver is in the national security interest of the United States."

The government modified the Federal Acquisition Regulations to incorporate the § 889 prohibitions and exceptions. *See* 48 C.F.R. §§ 4.2102, 4.2104. Rule 4.2102 discusses the § 889(a) prohibition on covered equipment and services; rule 4.2104(a) discusses § 889(d)(1) agency-head waivers; and rule 4.2104(b) discusses the Director of National Intelligence's § 889(d)(2) waiver authority.

In 2020, USAID told its industry partners that the Director of National Intelligence had issued USAID a DNI waiver under § 889(d)(2), to cover contracts that "advance [USAID's] foreign assistance mission overseas," which was valid until 2022. ECF No. 1-2 at 2-3. In 2021, USAID told its partners that it received a modified DNI waiver, valid through 2028, for "situations where [USAID] contractors and recipients aren't able to avoid using covered technology because there are no Section 889 compliant telecommunications service providers in the countries where they are working." ECF No. 1-3 at 2. In 2022, USAID awarded Q2 Impact a foreign assistance contract in Egypt supporting a USAID learning activity. ECF No. 1 at 8 [¶29]. There are no

telecommunications service providers operating in Egypt that are compliant with § 889, so USAID applied the modified DNI waiver to Q2 Impact's contract. *Id.* at 8 [¶31].

In 2023, the General Services Administration solicited proposals for its One Acquisition Solution for Integrated Services Plus (OASIS+) program. ECF No. 1 at 1 [¶1]; ECF No. 1-1 at 1. The OASIS+ program is a government-wide, multiple award, indefinite delivery, indefinite quantity acquisition program. ECF No. 1-1 at 12. The solicitation outlined several domains in which the government could award contracts. *Id.* at 23; ECF No. 1 at 3 [¶11]. The solicitation anticipated awarding multiple contracts in each of the domains, and a proposal could qualify to provide services across "one or more Domains." ECF No. 1-1 at 140; ECF No. 1 at 3 [¶11]. The solicitation explained that the government would award the contract to "All Qualified Offerors with a Fair and Reasonable Price." ECF No. 1-1 at 194. In other words, the government would then have those offerors on an approved list, and they would be eligible to bid for task orders in the relevant domain or domains. To join the approved list in a particular domain, an offeror "must meet or exceed the Domain-specific qualification threshold" and could do that using "any combination of qualifications detailed in each Domain's Qualifications Matrix to achieve the applicable qualifying threshold." *Id.* An offeror needed to show that it qualified for "36 out of 50 available credits" to be eligible for a contract in a particular domain. *Id.* at 202.

Q2 Impact submitted a proposal in the management and advisory domain. ECF No. 1 at 4 [¶15]. It claimed 38 credits for that domain, more than the 36-credit threshold. *Id.* In its proposal, Q2 Impact stated that it "will not provide covered telecommunications equipment or services to the Government in performance of any contract, subcontract or other contractual instrument resulting from [this] solicitation." ECF No. 1-4 at 126. However, given its active USAID Egypt contract, Q2 Impact also disclosed that it "does use covered telecommunications equipment or

services." *Id.* GSA requested clarification on Q2 Impact's use of covered equipment, and Q2 Impact explained that it uses covered equipment under USAID's DNI waiver because there is no alternative telecommunications infrastructure in Egypt. ECF No. 1 at 9 [¶ 35]. In other words, Q2 Impact connects to the Egyptian telecommunications infrastructure, which uses covered technology, but it does not otherwise use covered technology; it does not use covered technology outside that USAID contract. ECF No. 28 at 30:22-31:7. In 2024, Q2 Impact received a notification and written debriefing, stating that GSA had found it ineligible for the OASIS+ contract. ECF No. 1-6. The notice stated that Q2 Impact did not satisfy all requirements to be considered a qualifying offeror. *Id.* at 2. The notice explained that "GSA is unable to enter into a contract with any entity that represents it 'DOES' use covered telecommunications equipment or services … [, so] the proposal was removed from consideration for award and was not evaluated for claimed credits." *Id.* at 2-3.

Q2 Impact first protested its disqualification at the Government Accountability Office (GAO). GAO denied the protest, explaining that GSA would have to request or issue a new waiver to allow Q2 Impact to join the contract, and GSA was not obligated to do that. *In re QED Group LLC d/b/a Q2 Impact*, B-421775.4, 2024 WL 5245502 at *3-5 (November 12, 2024).

Q2 Impact then filed a bid protest in this court in November 2024. In January 2025, Q2 Impact and the government filed simultaneous motions asking the court to interpret § 889 and determine whether GSA's decision to exclude Q2 Impact from the OASIS+ competition was based on an erroneous interpretation of § 889 and its implementing provisions in the Federal Acquisition Regulations. ECF Nos. 17, 18-1.

**II.   Discussion**

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation

5

by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b). The court can grant "any relief that the court considers proper," including injunctive relief. *Id.* Under 28 U.S.C. § 1491(b), the Court of Federal Claims has "jurisdiction to review both pre-award and post-award bid protests." *Banknote Corp. or America v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The court "review[s] the agency's decision pursuant to … the standards found in the Administrative Procedure Act" (APA). *Id.* "Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 1350-51 (citations omitted).

Under the APA, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference. Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024) (quotation marks omitted). In some circumstances, the "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 394. "Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Id.* at 403. A court should not construe the law "with an eye to policy preferences that had not made it into the statute." *Id.* at 403-04. The court determines whether the statute has a "plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*,

6

519 U.S. 337, 340 (1997). In determining a statute's meaning, the court must look at the "specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341.

In this case, Q2 Impact has the correct interpretation of § 889. The statute as applied to agency-head waivers is different from the statute as applied to waivers issued by the Director of National Intelligence. Section 889(d)(1) is exclusively about waiver authority given to executive agency heads. It states, "The head of an executive agency may, on a one-time basis, waive the requirements under subsection (a) with respect to an entity that requests such a waiver. The waiver may be provided, for a period of not more than two years after the effective date[ ]" of the provision. Pub L. No. 115-232, § 889(d)(1). It requires a "compelling justification" for the waiver and a "phase-out plan" to eliminate the future need for covered equipment or services. *Id.* The ability of agency heads to provide a waiver under § 889(d)(1) expired in 2022. *See id.* at § 889(c).

Now, only the Director of National Intelligence may issue waivers under § 889(d)(2). DNI waivers are available more broadly; the only requirement is that the Director of National Intelligence "determine[ ] the waiver is in the national security interests of the United States." *Id.* at § 889(d)(2). For a DNI waiver, there is no requirement of a phase-out plan or requirement that it be issued on a one-time basis. *Id.*

### A. The government's interpretation largely depends on text and comments related to § 889(d)(1) agency-head waivers, not § 889(d)(2) DNI waivers

The government's argument relies on the text of the statute, the Federal Acquisition Regulations, and some comments in the Federal Register. ECF No. 17 at 7-11. That text and those statements arguably support the interpretation that, even though a particular covered product will not be used for the contract and is already covered by a waiver, the new contracting agency must get a separate waiver under the new contract. *Id.* While those statements arguably support the

government's view for an agency-head waiver, they apply almost exclusively to agency-head waivers. They do not apply in the same way to DNI waivers.

The text of the statute provides the Director of National Intelligence with very broad authority to grant a waiver. *See* Pub L. No. 115-232, § 889(d)(2). That contrasts with an agency head's authority to grant a waiver, which was limited to the first two years after the statute passed, was only "on a one-time basis," and required a "phase-out plan" for stopping the use of covered equipment and services. *Compare* § 889(d)(2) *with* § 889(d)(1).

The government cites a few regulations, including 28 C.F.R. § 4.2104(a), to support its argument that a waiver must specifically apply to the agency awarding the contract. ECF No. 17 at 10. But rule 4.2104(a), which implements § 889(d)(1), applies only to waivers issued by agency heads. By contrast, 28 C.F.R. § 4.2104(b) applies to DNI waivers and says, in total, "[t]he Director of National Intelligence may provide a waiver if the Director determines the waiver is in the national security interests of the United States."

The government also points to a notice of an interim final rule in the Federal Register; in it, the Federal Acquisition Regulation Council (FAR Council) rejected the idea of implementing a "uniform waiver process that would apply across agencies." ECF No. 17 at 10 (citing 85 Fed. Reg. 42672) (quotation marks omitted). The government argues that each agency thus must seek its own waiver if it wishes to contract with an entity that uses equipment subject to the § 889(a)(1) prohibition. *Id.* The cited sections of the Federal Register, like rule 4.2104(a), apply to agency-head waivers, not DNI waivers. In the Federal Register, the FAR Council discussed at length the agency-head-waiver process, including how to obtain agency-head waivers, phase-out plans for contractors to gradually stop using covered equipment, and expected costs over the 2-year period during which agencies were allowed to issue waivers. 85 Fed. Reg. 42667-72. Meanwhile, the DNI-

waiver process was only briefly acknowledged as a "a separate and distinct" waiver without a statutory "expiration date." 85 Fed. Reg. 42668.

The FAR Council's rejection of a "uniform waiver process" was made in the context of its discussion of the expected costs the government would incur over the 2-year period as a result of § 889(a)(1), primarily due to the cost of reviewing and processing agency-head waiver requests, not DNI waivers. 85 Fed. Reg. 42672. And it is logical that agency heads would not have a uniform process for providing agency-head waivers because agencies each operate differently, with different interests and different tolerances for risk. The Director of National Intelligence, on the other hand, has to weigh only whether a given waiver is in the national security interests, given the particular government needs for that solicitation.

There is one instance in the Federal Register outside the DNI section where the DNI waiver is mentioned: In the "Public Costs" section, in discussing the time it will take to remove or replace existing equipment, the Federal Register mentions DNI waivers, implying that the Director of National Intelligence may require phasing out the use of covered equipment. 85 Fed. Reg. 42670-72. Although the Director of National Intelligence may require a contractor to phase out its use of covered equipment, nothing obligates him to require that, and, for the time that the equipment is allowed, nothing says its use should prevent a contractor from receiving other government contracts for which the contractor does not use covered equipment. *See generally* Pub L. No. 115-232, § 889(d)(2); 28 C.F.R. § 4.2104(b); 85 Fed. Reg. 42670-72.

The government also cites the FAR Council's statement in the Federal Register that a waiver one agency receives for a procurement "will not necessarily shed light on whether a waiver is warranted in a different procurement with a separate agency," and that each "waiver is based on the agency's judgment concerning particular uses of covered telecommunications." ECF No. 17 at

10 (citing 85 Fed. Reg. 42667). Context reveals that that statement, like most of the others, is exclusively about the agency-head waiver process. The next sentence refers to "[t]his agency waiver process." 85 Fed. Reg. 42667. The surrounding paragraphs on the same page state that "[t]he agency may only grant the waiver request …," referring to the agency-head waiver process, and they discuss the "compelling justification" and "phase-out plan" that are applicable only to agency-head waivers. *Id.* None of that addresses the DNI waiver process.

The government points to language in 28 C.F.R. § 52.204-25(b)(2) as well. ECF No. 17 at 10. That regulation states that one of the § 889 prohibitions "applies to the use of covered telecommunications equipment or services, regardless of whether that use is in performance of work under a Federal contract." 28 C.F.R. § 52.204-25(b)(2). The government argues that a waiver must therefore apply specifically to the agency awarding the contract. ECF No. 17 at 10. The same paragraph states that the § 889 prohibition does not apply if "the covered telecommunication equipment or services are covered by a waiver described in 28 C.F.R. § 4.2104." Read as a whole, rule 52.204-25(b)(2) is better interpreted as saying that agencies cannot contract with companies that use covered equipment or services for any work—most surprisingly work outside any federal contract—absent a waiver for that equipment or those services. The government's cited sentence is most focused on the fact that even if an entity uses some covered equipment for non-government work, the equipment itself is still a problem, and the only way to address that problem is through a waiver. The regulation most likely points that out because a contractor might be surprised that its use of covered equipment for non-government work could affect its ability to contract with the government.

The government also cites USAID's Frequently Asked Questions in support of its argument. ECF No. 17 at 13-14. Those FAQs indicate that some agencies, including USAID,

10

understood that an entity that has a waiver for a contract with one agency would have to apply for a separate waiver to be eligible for a contract with a different agency, even if the covered equipment or services would be used only in performing the first contract. ECF No. 17-3 at 4-6. That guidance is from USAID is not binding on other agencies and certainly not the court.

> **B.  Under the text of § 889(d)(2), its accompanying regulation, and GSA guidance, GSA's view does not qualify for deference**

Neither the statutory text nor the accompanying regulation at issue, Pub L. No. 115-232, § 889(d)(2) and 28 C.F.R. § 4.2104(b), directly addresses the interpretive issue in this case. "Statutory interpretation begins with the words of the statute." *BASR Partnership v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015). "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 550 (2002) (citations and quotation marks omitted). The text of § 889(d)(2) is brief; it states, "The Director of National Intelligence may provide a waiver … if the Director determines the waiver is in the national security interests of the United States." The statute does not address whether a DNI waiver allowing an entity to use covered equipment in performing a contract with one agency means that other agencies are prohibited from contracting with that entity. The accompanying regulation, rule 4.2104(b), is similarly brief and does not address the question. Unlike 28 C.F.R. § 4.2104(a), which implements § 889(d)(1) by elaborating on the process for agency-head waivers, rule 4.2104(b) simply restates § 889(d)(2). Meanwhile, the Federal Register and cited agency FAQs discuss the § 889(d)(1) agency-head waiver process, planning, and costs, providing little context for interpreting the DNI-waiver process.

In *Loper Bright*, the Supreme Court recently held that "[s]ection 706 [of the APA] makes clear that agency interpretations of statutes … are *not* entitled to deference. … [I]t thus remains the responsibility of the court to decide whether the law means what the agency says." *Loper*

11

*Bright*, 603 U.S. at 391-92 (citations and quotation marks omitted). But the Supreme Court does give some weight to agency "interpretations and guidance" under *Skidmore*, saying that "[s]uch interpretations constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance consistent with the APA." *Loper Bright*, 603 U.S. at 394 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, the weight given to an agency's interpretation "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

For interpretation of a regulation, such as the Federal Acquisition Regulations, in *Kisor*, the Supreme Court held that, when applicable, an agency's reading of its own rule or regulation can still receive *Auer* deference. *Kisor v. Wilkie*, 588 U.S. 558, 580 (2019). The Court provided three requirements for an interpretation to qualify for that deference: (1) "the regulatory interpretation must be the agency's authoritative or official position, rather than [an] ad hoc statement not reflecting the agency's views"; (2) "the agency's interpretation must in some way implicate its substantive expertise"; and (3) the "agency's reading of a rule must reflect its fair and considered judgment." *Id*. at 577-79. Furthermore, a court may not "defer to a new interpretation … that creates unfair surprise to regulated parties." *Id*. at 579 (citations and quotation marks omitted).

In this case, GSA's interpretation of the Federal Acquisition Regulations warrants significant consideration because GSA is one of the most significant players in government contracting. But GSA and the FAR Council have discussed and addressed only the agency-head waiver process in the Federal Register. *See generally* 85 Fed. Reg 42665-72; 28 C.F.R. § 4.2104-05, 52.204-24-26; *supra* Part II.A.1. In other words, the government provides a reasonable interpretation that may be persuasive under *Skidmore* and may meet the *Kisor* standard for deference for the agency-head

12

waiver process, but none of that applies to § 889(d)(2), the related 28 C.F.R. § 4.2104(b), and the DNI waiver process. Neither the FAR Council nor GSA has released considered guidance related to § 889(d)(2) or rule 4.2104(b). In fact, the government has stated that no DNI waivers have even been granted other than USAID's waiver at issue here, a DNI waiver for the Defense Department that expired in 2022, and possibly a State Department DNI waiver. ECF No. 20 at 4 n.2; ECF No. 23 at 1 n.1, 2; ECF No. 28 at 61:14-62:24. So none of the government's cited discussions show that GSA has "thorough[ly] consider[ed]" § 889(d)(2)'s meaning as required by *Skidmore* for the court to grant GSA's interpretation significant weight. *Skidmore*, 323 U.S. at 140. Nor has GSA released an "authoritative" or "considered" interpretation of 28 C.F.R. § 4.2104(b), which would be required by *Kisor* for the court to defer to GSA's judgment. *Kisor*, 588 U.S. at 577-79.

Thus, the court must determine the meaning of § 889(d)(2) and rule 4.2104(b) without formal deference to GSA's interpretation in the government's briefs. *Loper Bright*, 603 U.S. at 391-92.

### C. Q2 Impact's DNI waiver applies to the covered technology it is using, so GSA is not prohibited from contracting with Q2 Impact under § 889(a)(1)(B)

The clearest reading of § 889(d)(2) is that a waiver from the Director of National Intelligence applies to the equipment or service for which the waiver is given, for use under the agency contract for which it is given, but does not apply to permit a contractor to use that or other equipment or services for another contract or outside its government contracts. The waiver means that the contractor is not prohibited from receiving other government contracts for which the contractor will not use covered equipment.

Section 889(d)(2) allows the Director of National Intelligence to grant a waiver based solely on national security interests. The Director's authority is not statutorily time-limited like agency heads' authority under § 889(d)(1). The Director does not have to rely on a plan to phase

13

out the use of the covered products, and the Director's authority is not, unlike agency-head authority, limited as "on a one-time basis." *Compare* § 889(d)(2) *with* § 889(d)(1).

As discussed, only a few DNI waivers have been granted, so there are limited real-world examples for the court to consider. Q2 Impact points to one relevant example: in GSA's frequently asked questions about § 889, GSA stated that it might enter into new contracts with "offerors with existing waivers granted by the [Office of the Director of National Intelligence], pursuant to the terms of the applicable waiver and any relevant implementing instructions." ECF No. 21 at 15-16 (citing ECF No. 21-1 at 18). That language implies that GSA has previously at least acknowledged the possibility of entering into contracts with contractors who had a preexisting DNI waiver by relying on the terms of that preexisting waiver, without seeking its own new DNI waiver.

Indeed, it would be oddly redundant to require the Director of National Intelligence to issue a new waiver to an agency, for the same equipment and same use on the same contract, for which the Director has already issued a waiver, restating that that use continues to be in the interest of national security. Q2 Impact acknowledges that if it needed to use covered equipment on a contract with another agency or for its own non-government-contract purposes, then the agency would need to obtain a new waiver from the Director of National Intelligence. ECF No. 21 at 6. The court agrees. The Director would in that case need to determine, for the first time, if that equipment and its intended use is in the interest of national security and warrants a § 889(d)(2) DNI waiver.

Q2 Impact and the government both reference an Army interpretation of DNI waivers, an interpretation that the government argues was based only on a now-expired DNI waiver that was given to the Defense Department. ECF No. 21 at 15; ECF No. 23 at 2-4. That Defense Department DNI waiver supports Q2 Impact's argument. The Army Federal Acquisitions Regulation Supplement provides guidance on how contracting personnel should authorize payments to merchants

14

that have a DNI Waiver. *See* Army Federal Acquisition Regulation Supplement, Appendix EE, 6-3, available at https://www.acquisition.gov/afars/6-3.-national-defense-authorization-act-section-889-representation (last visited Feb. 25, 2025). It provides contracting personnel with codes to use when a merchant has provided an affirmative § 889 representation but is covered by a DNI waiver. *Id*. Like the Defense Department contract that was granted the DNI waiver, which ended in 2022, the USAID contract is time limited, ending in 2028. ECF No. 1-3 at 2. And like the Defense Department contract, the USAID waiver applies only to certain uses—uses for the USAID contract. *Id.* The Defense Department DNI waiver was still effective to allow other agencies to contract with that Army contractor, and likewise, here, Q2 Impact's DNI waiver is still effective to allow other agencies to contract with Q2 Impact.

The DNI waiver at issue here applies to the equipment Q2 Impact is using for its existing contract with USAID in Egypt. As long as Q2 Impact is continuing to use covered equipment or services only for that existing USAID Egypt contract and is not using that equipment or other covered equipment elsewhere, the existing DNI waiver addresses that use. Other agencies, including GSA, are not prohibited from contracting with Q2 Impact and do not require a second waiver for that use.

>   **D.   The government's policy concerns can be addressed without a contorted statutory interpretation**

The government outlines two policy arguments in favor of its interpretation: (1) not spending federal tax dollars on covered products that pose national security threats; and (2) protecting federal agency networks from those threats. ECF No. 17 at 16-19. Under *Loper Bright*, the courts cannot construe the law "with an eye to policy preferences that had not made it into the statute." *Loper Bright*, 603 U.S. at 403-04.

Regardless, the first policy concern is not affected by either party's interpretation. USAID is already using Q2 Impact's covered equipment in Egypt; the money already has been or is being spent, regardless of whether Q2 Impact gets any future government contracts. ECF No. 1 at 9 [¶35]. Q2 Impact is also not proposing to use any covered equipment to perform the OASIS+ contract. *Id.* at 8-9 [¶32]; ECF No. 1-4 at 126. And if Q2 Impact receives the OASIS+ contract and finds that it needs to use covered equipment to perform any task order under that contract, it would need a new waiver to apply to that covered equipment.

Applicable to both policy concerns, the government argues separately that there is a general policy underlying § 889 to phase out the use of covered equipment. *E.g.*, ECF No. 20 at 4. As discussed above, that phase-out language appears in the statute itself, but only in the context of agency-head waivers. For DNI waivers, the Director has determined that until 2028, when he can revisit the question, Q2 Impact's use of covered equipment for the USAID contract is affirmatively in the interest of national security. Pub L. No. 115-232, § 889(d)(2).

As for the second policy concern—avoiding national security threats, particularly cyber-threats—the government is understandably concerned that, for example, a contractor's server might be compromised by having compromised equipment connected to it, thus compromising other, non-covered, equipment that might be used for other, more sensitive, government contracts. Even though the Director of National Intelligence may make the decision for two different agencies, those agencies might have different risk tolerances because their work might be more or less sensitive. But an agency's solicitation can specify that the agency will not accept a contractor that uses covered products even if that contractor has a waiver. If a particular contract or task order is especially sensitive, an agency can issue a solicitation that explicitly states that it will not accept contractors that use covered equipment, even if that equipment is subject to a DNI waiver. Nothing

in the court's decision prevents GSA from modifying the solicitation for OASIS+, or writing task orders, to add that caveat. But the statute itself and 28 C.F.R. § 4.2104(b) do not do that work for the agencies generally or for GSA specifically.

## III.     Conclusion

For the reasons stated above, this court has determined that GSA's decision to exclude Q2 Impact from the OASIS+ competition was based on an erroneous interpretation of § 889.

 s/ Molly R. Silfen
MOLLY R. SILFEN
Judge
